UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA

v.                                                          CASE NO. 8:11-cr-282-T-23TGW

AGILEO RAMOS
_____/

**<u>ORDER</u>**

Agileo Ramos moves (Doc. 115) for dismissal of Count One of the indictment (Doc. 1), which charges him with conspiracy to possess with the intent to distribute five hundred grams or more of cocaine. The United States responds (Doc. 120) in opposition. Ramos asserts that collateral estoppel requires dismissal of Count One perforce his acquittal on Count Two of the indictment, which charges him with possession with the intent to distribute and distribution. All agree that the question presented by the motion is whether the acquittal on Count Two necessarily decided in the defendant's favor a factual matter that the United States must necessarily prove in order to establish the defendant's guilt on Count One of the indictment. As stated in *United States v. Ohayon*, 483 F.3d 1281, 1293 (11th Cir. 2007):

> In *United States v. Lee*, we explained that another prosecution is barred when a fact necessarily determined at the first trial "in an essential element" of the remaining offense. This description from *Lee* became our standard formulation of the doctrine of collateral estoppel. 622 F. 2d at 1316 (5th Cir. 1980). . . . An "essential element," as described in

> *Lee*, is a factual component of an offense. . . . [T]he question was whether a fact, not a legal element, was shared by the offenses in question.

The nature of the evidence in this action and the nature of the jury's verdict preclude a confident determination of the exact failing the jurors perceived in the United States' evidence on Count Two, but at least several possibilities exist that present no impediment to the United States proof of Count One.

## DISCUSSION

Born in Mexico in 1938, Ramos has resided in the United States since 1975. Ramos has never attended school. He worked in the fields until blindness forced his retirement. He lives with his wife, four of his children, and his grandchildren ("lots of them," Ramos remarked) in a small compound comprising several mobile homes at the end of a road in a thinly populated rural area near Balm, Florida, which is east of Apollo Beach, Florida, on County Road 672. Due to his blindness, Ramos has lost his driver's license. Ramos had never been arrested before his arrest in this action.

Ramos testified that on the day of his arrest he had been spraying for flies (attracted by the manure from his eight cages of chickens) for over an hour when "two cars came into my place very fast – and I don't allow that in my place because there are a lot of children around." Ramos told the youngster who was holding his spray tank, "I'm going to go see those – and I used a bad word there. I'm gonna go see those sons of you-know-what to ask them why they came into my property."

- 2 -

Ramos testified that as he started toward the newly arrived car he "bumped into" Pablo Gomez-Benitez, who had come to see Ernesto Reyes, Ramos's son-in-law, "but [Gomez] didn't tell me what he was there for." Ernesto lived on Ramos's property but in another trailer, not in the trailer in which Ramos lived. While Gomez went to look for Ernesto, Ramos remained in that spot, "just standing, like an idiot." Ramos testified that the man seated in the nearby truck called to him, he approached the truck, the driver rolled down the window, someone asked to borrow Ramos's knife, Ramos withdrew the knife from his pocket, and he handed the knife to the driver. Ramos testified that when he handed his knife to the driver he saw through the window a package, which Ramos described as "garbage" – meaning drugs. On direct examination, Ramos testified that he was not a drug trafficker and that he had never seen drugs in his life. Ramos said, "I'm a virgin when it comes to drugs and all of that."

During cross-examination the question arose whether Ramos said to the driver of the truck "*no seas desconfiado*." Ramos responded, "Because [the driver] was saying to Pablo, I'm afraid of being here, but he didn't have any reason. Then, why are you – why are you not – distrustful. But I didn't know they were going to do drugs." Ramos testified that he stood for a time next to the truck as the two occupants of the truck talked but that the window of the truck was raised, that the driver lowered the window to ask for a knife, and that the driver again raised the window after receiving Ramos's knife. Ramos said he walked away from the truck:

>   Q  Did not turn around and walk away, did you?
>
>   A  Of course. Of course I did.
>
>   Q  No, sir. You took that bag which contained what you now believe to be drugs from Detective Cruz, did you not?
>
>   A  No.
>
>   Q  You are telling this jury today that you did not take this package in the condition that it was on April 26th of 2011 out of the hands of Detective Cruz? Is that what you are telling us now?
>
>   A  That's what I'm telling you now and always.
>
>   Q  And so you are also telling this jury today that you never transferred that bag to the hands of Ernesto Reyes Huerta and told him to put it in your truck, correct?
>
>   A  No, no, no, no.
>
>   Q  What you want this jury to believe today is that you walked away from the cocaine after you saw that there were drugs in the car?
>
>   A  I went walking just a little bit like from here to there when all the men showed up.
>
>   Q  But you want this jury to believe that you were walking away from the drugs and that you never had them in your hands, correct?
>
>   A  That's true.

On re-direct examination Ramos denied using the words "*no seas desconfiado*" or "words like that" during the drug transaction and denied that his voice is the voice speaking those words on law enforcement's audio recording of the episode. Ramos

- 4 -

also testified that after his arrest he authorized the police to search his home ("As long as they don't destroy it they can go and search everywhere.") and that the police found nothing incriminating.

Suffice to say that, in order for the jurors to conclude that the United States failed to prove that Ramos knowingly and willfully possessed drugs on that day, the jurors need only have believed the testimony of Ramos that he did not know the visitors to his property on that fateful morning were present for a drug transaction; that he never took into his hands the drugs that were present, or that, if he did, he did not "knowingly and willfully possess" the drugs because he did not "control" them; and that, accordingly, he was merely a passive and uninformed observer on that day and at that moment. If the jurors so found, Ramos's age, blindness, and general affect undoubtedly contributed to the jury's determination that he was unaware of the meaning of the particular events of that day.

In all events, the United States' failing to prove beyond a reasonable doubt that Ramos knowingly and willfully possessed drugs on that day is not a failing that precludes the United States' proving that on an earlier day Ramos conspired to possess with the intent to later distribute the drugs in question. (Of course, whether the prosecution can prove that alleged conspiracy is another question entirely.) Stated from a different vantage: That Ramos at some earlier time conspired with Ernesto and Pablo to possess the drugs with the intent to sell at some future time does not necessarily mean, especially given Ramos's physical and other frailties, that

- 5 -

Ramos knew the details of the daily activity of his co-conspirators or that he knowingly and willfully possessed the drugs on the day in question and at the particular time in question. That might be the case, but that is not necessarily the case. For example, suppose Ramos had lent Ernesto and Pablo some money with which to buy the drugs or suppose Ramos consented to Ernesto and Pablo's using Ramos's land as a relatively safe site for the drug deal (whenever it occurred) or suppose Ramos lent Ernesto and Pablo his vehicle for use in the drug business – in any of these instances in exchange for a percentage of the conspiracy's profit, either paid directly to him or used to defray the expenses of the Ramos family. In each of these instances Ramos would have conspired to possess with the intent to distribute. Yet, each of these possibilities is provable by the United States without running afoul of the jury's acquittal of Ramos for the knowing and willful possession of drugs on the day in question.

The defendant aggressively argues the applicability, both legal and factual, of *United States v. Ohayon*, 483 F.3d 1281 (11th Cir. 2007), which features charges and a verdict that are structurally similar to the charges and the verdict in Ramos's case but which features facts (and the facts govern the determination of collateral estoppel) that are completely dissimilar to, and analytically distinct from, the facts in Ramos's case. Ohayon had traveled from Amsterdam to Vancouver to Los Angeles to Miami to Atlanta to Kunert's Atlanta hotel room, where Ohayon received three duffel bags

containing drugs. After Ohayon's acquittal of attempted possession, the district court determined:

> . . . based on the jury instructions and the fact that Ohayon relied on one defense, that the government failed to prove that Ohayon was aware that there were drugs in the bags. Because it would be "logically inconsistent" to conclude both that Ohayon did not know the bags contained drugs and that he was aware of and participated in the conspiracy to possess those drugs, the court held that the government was collaterally estopped from re-trying Ohayon and dismissed the indictment.

483 F. 3d at 1285.

In *Ohayon*, the prosecution offered and the evidence supported only a single reason – consistent with the hypothesis of guilt – that the defendant entered the hotel room to receive delivery of the three duffel bags containing the drugs; that reason was that he had conspired to do so. No other reason – consistent with the hypothesis of guilt – appeared for his presence in the hotel room and his receiving the duffel bags. If Ohayon had not, in accord with the plan of a conspiracy, entered the room in an attempt to possess the drugs, his entry into the room was for some other reason (Ohayon offered a plausible and non-felonious alternative reason) unconnected with the conspiracy and inconsistent with the hypothesis of guilt. By finding that the prosecution failed to prove that Ohayon knew the duffel bags contained drugs, the jury negated any possibility of Ohayon's conspiratorial and guilty knowledge, and absolutely precluded – within the confines of the governing facts – any chance of conviction for conspiracy to possess the drugs about which – the jury necessarily

found – Ohayon lacked knowledge. The facts in *Ohayon* created a stark "either/or" situation. Either Ohayon knew the drugs were in the duffel bags and Ohayon was a conspirator or Ohayon did not know the drugs were in the duffel bags and Ohayon was not a conspirator. If he were a conspirator, he would not have come to the room except to acquire the drugs; if he were not a conspirator, he came to room for some other reason. The facts in *Ohayon* present no alternative hypothesis of guilt on the charge of conspiracy except the one that includes Ohayon's knowledge that drugs were in the duffel bags.

On the other hand, in the present case, the jury simultaneously asked three questions (reproduced here without alteration) that suggest the nature of the jury's determination:

> Since it was the understanding the drugs were on Agileo Ramos property does that define he was in possession?
>
> Since the drugs were placed in his vehicle does that define possession?
>
> Or if he had in his hands does that define possession?

The objective of these questions is obviously to determine, irrespective of Ramos's claimed lack knowledge of the events of that day and in light of his claimed failure to actually receive the package of drugs from within the truck (or perhaps even if he received them), whether Ramos "possessed" the drugs merely because the package of drugs was on Ramos's property or inside of his truck under someone else's control or whether he necessarily "knowingly and willfully possessed with the intent to

- 8 -

distribute" merely because the package came momentarily into his hands (which he denied) as he handed the package from one person to another at another person's instruction. The court's answer to the jury's questions focused on "control" of the drugs as a necessary component of "possession" and referred the jurors to the pertinent part of the earlier instructions. With these questions and answers and with the court's instructions in hand, the jury acquitted Ramos on Count Two and deadlocked on Count One.

In summary, the jury could have concluded that Ramos neither knowingly nor willfully possessed the drugs with the intent to distribute on the day in question because, for example, he lacked knowledge that the transaction would occur (or was occurring) or because Ramos never "possessed" the drugs because the drugs were under the control of the Pablo Gomez and Ernesto Reyes (or the undercover law enforcement officer). But, a juror could reasonably conclude (and some obviously did), consistent with the verdict on Count Two, that Ramos at some earlier time in some way had conspired with Pablo and Ernesto to acquire the drugs for the purpose of distribution. Again, whether the prosecution can prove the antecedent agreement is problematic but the prosecution is not barred – at least, not by the jury's acquitting Ramos of possession – from undertaking that problematic proof.

Not every acquittal nor even most acquittals for actual possession with the intent to distribute a particular cache of drugs bars proof of a conspiracy to possess those same drugs with the intent to distribute. In complete accord with *Ohayon* and

*Lee*, a person can be a conspirator without at every moment during the conspiracy "possessing" the drugs. After all, as judges have instructed jurors in the Eleventh Circuit for decades, "a person may be a conspirator without knowing all the details of the unlawful plan" and "if the [person] played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in the plan on at least one occasion." Offense Instruction 13.1, Eleventh Circuit Pattern Jury Instructions – Criminal (2010). The prosecution's failure to prove possession of drugs on one occasion will rarely preclude by force of collateral estoppel the prosecution's proof of an agreement for an unlawful purpose on a separate occasion.

## CONCLUSION

The motion to dismiss (Doc. 115) is **DENIED**.

ORDERED in Tampa, Florida, on November 14, 2012.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE